**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES A. BAKER,** | : | |
| | : | **Civil Action No. 1:05-CV-2643** |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| v. | : | |
| | : | |
| **UNITED DEFENSE INDUSTRIES,** | : | |
| **INC., d/b/a BAE SYSTEMS LAND** | : | |
| **& ARMAMENTS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the Court is Defendant United Defense Industries's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. No. 62.) The motion is ripe for disposition. For the reasons that follow, the motion will be granted.

## I.     BACKGROUND

### A.  Factual Background[1]

This case arises from the termination of Plaintiff James Baker's ("Baker") employment with Defendant in 2005. Baker was initially hired as a supervisor of training and development by Bowen McLaughlin York—later becoming known as United Defense Industries—in 1991 at the age of 46. (Doc. No. 64 ¶¶ 11-12.) He was promoted twice from this position, first to manager of training and development in 1994 and then to HR manager at Defendant's York, Pennsylvania facility in 1998 when he was 53 years of age. (Id. ¶¶ 13; 16.) As HR manager, Baker was responsible for a variety of employee relations issues such as compensation, communicating changes in benefits, staffing, advertising for open positions, interviewing, and administering the

---

[1] The following facts are undisputed unless otherwise indicated. (See Doc. Nos. 64; 68.)

Defendant's reduction-in-force program.  (Id. ¶ 21.)  He was also responsible for administering Defendant's affirmative action and equal employment opportunity policies.  (Id. ¶ 22.)  Baker spent about 20 percent of his time traveling to fulfill these duties.  (Id. ¶ 23.)  Starting in 2001, Baker was directly supervised by Gary Flannagan ("Flannagan"), the director of human resources for the ground systems division.  (Id. ¶¶ 14-15; 19.)  Flannagan himself reported to Elmer Doty ("Doty"), vice president of the division.  (Id. ¶ 20.)

Defendant's employees are evaluated on their performance by their supervisor each year, with performance designations of "exceptional, outstanding, good, and needs improvement."  (Id. ¶ 28.)  Baker's review period ended each year on August 31, and he had received a rating of "outstanding" on his performance reviews from Flannagan in 2001 and 2002.  (Id. ¶¶ 29-32.)  His rating declined for the period of September 1, 2002 through August 31, 2003, however, when he received a rating of "good" on his review from Flannagan.  (Id. ¶ 34.)  Flannagan reduced Baker's rating because he showed inability to collaborate with other human resources staff, began failing to attend scheduled meetings, and did not complete assignments on time or keep Flannagan informed of his progress.  (Id. ¶¶ 35-36; see also Doc. No. 65-12 Ex. C, Deposition of Gary Flannagan at 43:16-44:9 ("Flannagan Dep.").)  Plaintiff contends without citation to the record that despite the reduction in his performance rating and his failure to attend some meetings, Defendant has failed to set forth "any evidence to suggest that Plaintiff's performance was in any way, deficient."  (Doc. No. 68 ¶¶ 35-36.)

In 2003 and 2004, Baker was involved in two incidents that caused employees to file ethics complaints with Defendant.

### 1.  The Hawkins Incident

Woody Hawkins ("Hawkins") was an expatriate employee working in Egypt at Defendant's tank plant in Cairo. (Doc. No. 64 ¶ 38.) After customers had complained about Hawkins and his performance began to decline, James Byrnes ("Byrnes")—the manager in charge of Defendant's Egpyt operations—decided to eliminate his position. (Id. ¶¶ 39; 45.) Byrne reported to John Tile ("Tile"), a line manager in Defendant's York, Pennsylvania facility, and Baker was Tile's and Byrnes's point of contact relative to human resources issues. (Id. ¶¶ 37; 40; 42-43.) As point of contact, Baker was responsible for advising the line managers on issues arising in termination proceedings, such as collecting the necessary supporting documentation to ensure that Defendant's human resource policies and procedure were followed. (Id. ¶ 42; 44.) Byrnes informed Baker and Tile that he wanted to eliminate Hawkins's job and combine it with another position, effectuating a reduction in force whereby the position would ultimately be eliminated. (Id. ¶¶ 45; 47.) When initially informing Flannagan about Byrnes proposal to eliminate Hawkins's position, Baker noted that Byrnes had already indicated some resistance to his advice and counseling on the proper method to effectuate the termination. (Id. ¶ 49.) In response, Flannagan advised Baker that it was critical for Baker to closely manage the process and perform due diligence before proceeding with the termination; he specifically instructed him to ensure that Hawkins was neither qualified for the new position nor could he be made qualified within a reasonable period of time. (Id. ¶¶ 51-52.) In response to Flannagan's inquiries, Baker affirmed that Hawkins had been informed about the elimination of his job due to performance deficiencies and that these deficiencies had been documented. (Id. ¶¶ 53-54.) Despite this, Baker did not travel to Egypt himself and did not collect documentation from Byrnes reflecting either that Hawkins had been made aware of his performance deficiencies or

that Hawkins lacked qualifications for the newly created position.  (Id. ¶¶ 55; 58; 66.)  Baker also never undertook any investigation to ascertain whether Byrnes properly documented the reasons for Hawkins's termination and admitted in a conversation with Tile subsequent to Hawkins's termination that he did not know whether Byrnes had properly documented the reasons.  (Id. ¶ 67-68.)  Baker was merely relying upon information relaid to him by Byrnes himself.  (Doc. No. 68 ¶¶ 53-54.)  Tile believed that Baker had covered the necessary procedures with Byrnes for properly terminating Hawkins, and Defendant claims that, based on Baker's assurances that the necessary procedures had been followed, Flannagan agreed to Hawkins's termination.  (Doc. No. 64 ¶¶ 59; 60.)  Baker contends that Flannagan was not relying on him because the record shows he had numerous conversations with Flannagan and Ronald Whillock ("Whillock")—Vice-President of Human Relations—discussing Byrnes's failure to follow procedure.   (Doc. No. 68 ¶ 60.)

After Hawkins's termination, it became clear that Byrnes had not followed correct procedure.  (Doc. No. 64. ¶ 61.)  No one had ever approached Hawkins about his performance deficiencies, his ability to perform the duties of the newly created position, or, even the fact of his termination; Hawkins only learned that he was terminated after seeing his job posted in a company newsletter.  (Id. ¶¶ 63-64.)  Baker acknowledges that this form of notification was improper, but contends that he had counseled Byrnes that he was not handling the reduction in force in a proper manner.  (Doc. No. 68 ¶ 65; see also Doc. No. 68-7 Ex. D, Deposition of James Baker at 125: 11-17 ("Baker Dep").)  Hawkins submitted an ethics complaint about the incident to Thomas Rabaut ("Rabaut"), Defendant's President and Chief Executive Officer, prompting an investigation by Whillock that ultimately led to Hawkins's reinstatement because Byrnes had

mishandled the termination and possibly initiated it for an improper purpose. (Doc. No. 64 ¶¶ 70-79; 85-86.) After Baker had received a copy of Hawkins's ethics complaint, he informed Flannagan about additional resistance Byrnes had given him during the process and acknowledged that some of the information he had received from Byrnes was not accurate. (Id. ¶ 82.) Baker did not take any steps to confirm that information provided by Byrnes was correct or to counteract Byrnes's resistance to his advice. (Id. ¶ 83.) Baker's superiors—Doty, Tile and Flannagan—all received reprimands and lowered performance evaluations from their respective superiors for this incident. (Id. ¶¶ 87-88.) Defendant contends that Baker's deficient performance in the incident would have been reflected in his September 2003 to August 2004 performance evaluation, but that evaluation was never finalized in light of the decision to terminate Baker's employment in 2004. (Id. ¶¶ 91-93.) Baker admits only that he never received a performance evaluation for that period and denies, without citation to the record, that the incident would have been reflected in his unfinished annual performance evaluation. (Doc. No. 68 ¶¶ 91-92.) Baker admits, however, that as of March 3, 2005, he believed his ultimate termination related to "a decision [he] had made some seven months earlier" with respect to the Hawkins termination.

### 2. The Waltimeyer Incident

The second incident involved Thomas Waltimeyer ("Waltimeyer"), a production supervisor in Defendant's York, Pennsylvania facility who was terminated after a reduction-in-force eliminated his position. (Doc. No. 64 ¶¶ 95-96.) When a reduction-in-force occurs, the procedure is to first ask for retirement volunteers, and then to assemble a committee to determine which employees will be terminated. (Id. ¶¶ 98-99.) The committee assesses each employee's

job history to create a ranking; the lowest ranked employee is generally terminated, subject to the "business case" exception when there is a compelling business reason to retain the lower ranked employee.  (Id. ¶¶ 100-101.)  As mentioned, Baker was responsible for effectuating these reductions-in-force pursuant to the official policy and procedures that he helped to draft.  (Id. ¶ 97.)

Waltimeyer was not the lowest-ranked employee within his job cluster, but was terminated in the reduction-in-force because three lower-ranked employees were subject to the business case exception.  (Id. ¶ 102.)  Waltimeyer found out that he did not have the lowest score and challenged Baker about his termination, asking to see the particulars of the ranking process; he was not aware of the business case exception.  (Id. ¶¶ 104-105.)  While Baker told Waltimeyer he could see his ranking and the calculation of that ranking, he did not inform Waltimeyer about the business case exception or explain that the exception had been applied to lower-ranked employees.  (Id. ¶ 106.)  Baker instead informed Waltimeyer that his score was at the bottom of the rankings and Waltimeyer was led to believe that his score was the sole basis for his termination.  (Id. ¶¶ 107; 115.)  Defendant contends that there was no policy or procedure that prohibited employees from being notified of the existence of a business case exception and both Flannagan and Whillock believed an employee should be told the accurate facts and circumstances supporting a reduction-in-force that eliminated his position.  (Id. ¶¶ 108-109.)  Baker contends that he violated no policy with respect to the Waltimeyer termination because Defendant did not have any policy or procedure that required employees to be notified that a business case exception had been made; Baker believed that providing this information would send up a "red flag" about the reduction in force.  (Doc. No. 68 ¶¶ 106; 108-109.)

Waltimeyer subsequently filed an ethics complaint with Defendant about the termination, leading to an investigation by Dan Sharp ("Sharp"), Defendant's in-house counsel. (Doc. No. 64 ¶ 110.) Sharp concluded after his investigation that while the reduction-in-force was conducted properly, Baker provided Waltimeyer with false and/or misleading information in his exit interview and such behavior could lessen the efficacy of the reduction-in-force procedure. (Id. ¶ 114; 117.) Sharp, Whillock, and Flannagan all believed Baker had acted inappropriately in handling the Waltimeyer situation, despite Baker's protestations that he did not want to send up any red flags. (Id. ¶¶ 116-118.)

### 3. Relationship with Co-workers

Beyond the two incidents mentioned above, Defendant also contends that Baker had poor interpersonal relationships with his peers in the HR department. He had been instructed on several occasions to improve his relationship with other HR employees; feedback from other HR personnel indicated that he was defensive, was resistant to change, and preferred working alone. (Id. ¶ 133-134.) Whillock felt Baker demonstrated poor judgment as a human resource manager because he regarded Baker as "hard-headed, meaning that he would not listen to other people. He considered himself as knowing it all." (Id. ¶¶ 136-137.) Sometimes these characteristics did interfere with his work, as with one project he worked on for the Office of Federal Contract Compliance together with Seturah Walker ("Walker")—a director in the HR department. Baker insisted that the project be completed in a certain way, contrary to advice and guidelines from the Office of Federal Contract Compliance. (Id. ¶ 139.) Baker's information for the project turned out to be deficient and he could not assist Walker in correcting the problem before the deadline; he had scheduled a vacation and did not inform Walker of his plans to leave until shortly before

he left.  (Id. ¶¶ 139; 141.)  This interaction led Walker to believe that Baker was stubborn and reluctant to listen and consider other opinions.  (Id. ¶ 140.)

### 4.  Baker's Termination

After these incidents, Doty wrote a memorandum to caution Flannagan about the major issues with the delivery of HR services and express "grave doubts" about the support management was receiving from the HR department.  (Id. ¶¶ 120-121.)  Flannagan undertook an investigation of the HR department to correct these issues, which culminated in an interim performance memorandum to Baker citing the two incidents and noting various deficiencies in Baker's performance and professional demeanor.  (Id. ¶ 126.)  Flannagan requested and Baker produced a written action plan on improving his performance.  (Id. ¶ 127.)  In his plan, Baker acknowledged the above incidents "clearly demonstrate a series of communication miscues," and that he had missed set meetings with Flannagan.  (Id. ¶¶ 129-130.)  Baker also acknowledged that he viewed or dismissed communications with his peers as a "nice thing to do" rather than an essential function of his position, despite admitting that his failure to meet one-on-one with other human resource professionals on any regular basis caused "poor cohesiveness" within the management team.  (Id. ¶¶ 131-132.)  Defendant contends this shows Baker acknowledged his poor interpersonal skills, but Baker denies without citation to the record that he had poor interpersonal relationships with his peers.  (Doc. No. 68 ¶ 132.)

Doty and Flannagan continued to be concerned even after Baker's performance action plan because multiple members of management had lost confidence in Baker's ability to provide accurate, timely, and consistent advice, especially after the Waltimeyer and Hawkins incidents.  (Doc. No. 64 ¶¶ 146-147.)  While Baker protests that he did not violate any policy or procedure

in his handling of the Hawkins of Waltimeyer incidents, (Doc. No. 68 ¶¶ 146-147), Doty felt that these two incidents had done irreparable damage to Baker's credibility and made him more of a liability to the organization than an asset (Doc. No. 64 ¶ 147). After conversations[2] with other employees and an anonymous peer review showed several employees were dissatisfied with Baker, Doty and Flannagan were convinced that Baker could not continue to function as an HR professional at the company. (Id. ¶ 150.) As such, Flannagan decided that Baker would have to be fired. (Id. ¶¶ 152-153.) Baker denies, without citation to the record, that Doty and Flannagan were convinced to fire him by the above concerns, and further adds that the comments in the peer review were intended only to benefit the employee and not form the grounds for a decision to terminate. (Doc. No. 68 ¶ 150.)

Defendant contends that in October 2004, Flannagan informed Baker that he would be terminated at the end of the first quarter of 2005 irrespective of his performance. (Doc. No. 64 ¶ 153.) While Flannagan asked Baker if he would accept a separation package, his termination was not contingent on coming to agreement on severance. (Id. ¶ 153-54.) Baker denies that any certain date had been set for his termination. Rather, he contends Flannagan only informed him that Doty wanted him fired and that if he did not accept a separation package Defendant would start documenting his actions with the intent of terminating him; he would remain employed if he did not do anything to warrant termination. (Doc. No. 68 ¶¶ 153-54.) Baker further contends that his departure at the end of the first quarter of 2005 was premised on the assumption that an

---

[2] The Plaintiff asserts that these statements made by other employees are hearsay and cannot be considered by the court on summary judgment. (Doc. No. 68 ¶¶ 135; 149.) Defendant argues that these statements are put forward only to establish management's state of mind as to how Plaintiff was perceived among his peers and not for the truth of the matter asserted. (Doc. No. 71 at 12.) For purposes of this memorandum, the Court will consider these statements for that limited purpose.

acceptable severance package would have been negotiated by then. (Id.) The parties were never able to agree to the terms of a severance package, and on April 8, 2005, Flannagan sent a memorandum to Baker finally terminating his employment pursuant to the understanding reached in October 2004. (Doc. No. 64 ¶ 169.) Baker's duties were primarily redistributed to three employees: Sonefelt (54 years old), Barge (57 years old), and Danilowicz (27 years old). (Id. ¶¶ 172; 185-186.)

### B. Procedural History

On March 3, 2005, Baker filed an initial charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was followed by an additional charge of retaliation filed on May 7, 2005. The EEOC issued a dismissal notice as to both charges stating that it was unable to conclude violations had occurred and informing Baker of his right to initiate suit. (Doc. No. 68-3 Ex. B.) Thereafter, on December 21, 2005, Baker initiated this action. (Doc. No. 1.) The amended complaint sets forth claims of discrimination and retaliation under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("ADEA"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951-963 ("PHRA"). (See Doc. No. 17.)

### C. Standard of Review

The Defendant has moved for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## II.    AGE DISCRIMINATION[3]

The Defendant has advanced several arguments in support of summary judgment on

Baker's discrimination claims under the ADEA.  Under the ADEA, it is unlawful for an

employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age."  29 U.S.C. 29 § 623(a)(1).  To prevail on an ADEA

termination claim, a plaintiff must show that his or her age "actually motivated" and "had a

determinative influence on" the employer's decision to fire him or her.  See Fakete v. Aetna, Inc.,

308 F.3d 335, 337 (3d Cir. 2002).  This showing can be made either by "(1) presenting direct

evidence of discrimination . . . , or (2) presenting indirect evidence of discrimination that satisfies

the familiar three-step framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793

(1973)."  Id.  Plaintiff does not argue that there is direct evidence of discrimination, but contends

solely that summary judgment should be denied based on the *McDonnell Douglas* burden-

shifting framework.  (Doc. No. 70 at 5.)  Under *McDonnell Douglas*, the plaintiff must first

establish a prima facie case of discrimination.  See Brewer v. Quaker State Oil Refining Corp.,

72 F.3d 326, 330 (3d Cir. 1995).  Once the plaintiff establishes a prima facie case, it creates a

presumption of discrimination and the burden of production then shifts to the defendant to

provide a legitimate, nondiscriminatory reason for the adverse employment decision.  Id.  If the

defendant produces this reason, the plaintiff must prove that the employer's stated reason is

pretextual.  Id.  Defendant contends both that Baker has not established his prima facie case of

---

[3] There is no dispute that Baker's claims under the PHRA are subject to the same standards as those under
the ADEA.  See Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).  Accordingly, the Court's discussion of
the ADEA claims will encompass the claims made under the PHRA.

age discrimination and also that its proffered reasons for terminating him are legitimate and

nondiscriminatory. The Court will address these contentions in turn.

### A. Prima Facie Case of Age Discrimination

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must

establish that: (1) he is over forty; (2) he is qualified for the position in question; (3) he suffered

from an adverse employment decision; and (4) his replacement was sufficiently younger to

permit a reasonable inference of age discrimination. Potence v. Hazleton Area School Dist., 357

F.3d 366, 370 (3d Cir. 2004) (citing Duffy v. Paper Magic Group Inc., 265 F.3d 163, 167 (3d Cir.

2001)). Defendant only challenges Baker's case on the third and fourth prong of the prima facie

showing. (Doc. No. 63 at 4.)

### 1. Adverse Employment Decision

Baker simply asserts that he was terminated and that such termination constitutes an

adverse employment action for purposes of the prima facie case. Defendant's brief suggests that

Baker must show, as part of the third prong of the prima facie case, that "he suffered from an

adverse employment decision because of his age." (Doc. No. 63 at 4.) The Court disagrees.

While the Defendant goes on for several pages about the lack of evidence of age bias in

Defendant's decision to terminate Baker, it misapprehends the purpose of the prima facie case

under *McDonnell Douglas*. Indeed, the ultimate issue an ADEA plaintiff must prove is that the

employer took an adverse employment action against an employee because of his or her age. See

Fakete 308 F.3d at 337 ("The ADEA makes it unlawful, *inter alia*, for an employer to fire a

person who is at least forty years old because of his or her age.") The purpose of the *McDonnell*

*Douglas* framework—the first stage of which is for the plaintiff to establish a prima facie

case—is to allow a plaintiff to make this ultimate showing by indirect evidence that raises the inference of discrimination in the employer's decisions. Therefore, requiring Baker to make a showing on the causal connection between the adverse employment action and his age as part of his prima facie burden would defeat the purpose of *McDonnell Douglas*. <u>See</u> <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3rd Cir. 1995); <u>see also</u> <u>Morrow v. American Bag Corp.</u>, 23 Fed. Appx. 450, 454 (6th Cir. 2001) ("[T]he district judge erroneously added to the plaintiff's burden at the initial stage of the litigation by intimating that part of the *prima facie* showing required of the plaintiff is establishment of a causal connection between the adverse employment action and the plaintiff's age. . . . That proof, however, is tantamount to ultimate vindication on the discrimination cause of action and is not required merely to establish a *prima facie* case of such discrimination." (citing <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000))). Because there is no dispute that the Plaintiff was terminated from his position, the Court finds that the Plaintiff has made a sufficient showing of the third part of his prima facie case.

### 2. Replacement by Younger Employees

The Defendant claims that Baker cannot establish the fourth element of his prima facie case because he was not "replaced" by younger employees but rather his duties were redistributed to a number of different individuals throughout Defendant's organization—including Sonefelt (54), Barge (57), and Danilowicz (27). (Doc. No. 63 at 10; Doc. No. 71 at 4.) Relying on cases from other circuits, <u>see</u> <u>Hitt v. Harsco Corp.</u>, 356 F.3d 920 (8th Cir. 2004), the Defendant argues that—in cases where the employee's duties are absorbed by other employees— the Court should modify the fourth element of the prima facie case to require a plaintiff to proffer evidence that

younger employees were treated more favorably. The Defendant contends that the record would not support Baker's prima facie case under such a modification. (Doc. No. 63 at 10.) Baker asserts that he can establish the fourth element because there is no dispute that Holly Danilowicz assumed part of his job responsibilities and she—at less than half of Plaintiff's age—is sufficiently younger to create an inference of discrimination. (Doc. No. 70 at 4.)

In similar situations to the one now before the Court, the Third Circuit has not adopted a modification to the fourth element of the prima facie case that the Defendant proposes. Rather, the Third Circuit has held that "a discharged age-discrimination plaintiff who presented evidence that a younger employee assumed his responsibilities when his employer decided not to replace him had met his prima facie burden." Torre v. Casio, Inc., 42 F.3d 825, 831 (3d Cir. 1994). When multiple employees have assumed a plaintiff's job responsibilities, the Third Circuit has considered their combined differences in age in assessing whether the fourth element has been met. See Sempier, 45 F.3d at 729-730 (holding that the combined difference in age between plaintiff and four-year-younger and ten-year-younger coworkers assuming his responsibilities was "clearly sufficient" to satisfy the fourth element of a prima facie case). The Third Circuit has further reasoned—albeit in an unpublished opinion—that the average age, the age of each individual coworker who took over some portion of the duties, and also the portion of duties each coworker assumed are relevant considerations in assessing the inference of age discrimination. See Steward v. Sears Roebuck & Co., 231 Fed. Appx. 201, 209 (3d Cir. 2007).

The Court finds that Baker can establish the fourth element of his prima facie burden for purposes of summary judgment. Here, there is no dispute that Baker is two years older than Barge, five years older than Sonefelt, and thirty-two years older than Danilowicz. The Third

Circuit has never articulated a set age difference to satisfy the fourth element of the prima facie case of age discrimination, see Sempier, 45 F.3d at 729, but, based on the individual ages of these employees and the combined difference in age of each individual as compared to Baker, the record is sufficient to raise the inference of age discrimination. Further, though Defendant argues that the majority of Plaintiff's responsibilities were not redistributed to Danilowicz, the record is not entirely clear on this point. Baker was responsible for employee relations issues such as compensation, communicating changes in benefits, staffing, advertising for open positions, interviewing, and administering Defendant's reduction-in-force program as well as affirmative action and equal employment policies. (Doc. No. 64 ¶¶ 21-22.) Defendant admits that Danilowicz took over "several of Baker's responsibilities for compensation and benefits." (Doc. No. 71 at 4; see also Doc. No. 64 ¶ 172.) In his deposition, Baker described his duties under compensation and benefits:

> Q: And what were your duties concerning benefits?
>
> A: Communicate benefit changes, open enrollment in the fall of the year, responding to employees' issues surrounding reimbursement for medical expenses. I was the on-site coordinator for HIPA (Health Insurance Portability Act), basically to go to a person on site for any – any issues around benefits. . . .
>
> Q: Okay. And what were your responsibilities with regard to compensation?
>
> A: Pretty much everything related to the site compensation: establishing the salary structure, administering the compensation system, educating employees and managers on how the compensation system worked, assisting managers in making decisions about pay increases; recommending to corporate salary range movements, merit pay increases, analyzing positions for proper grading and compensation based on market. Just overall general management of the compensation . . . .

(Baker Dep. at 74-75.)  Danilowicz's own description of her duties is certainly more general:

> Q: As a senior HR rep, what are your general job responsibilities?
>
> A: Mainly reviewing job descriptions with managers, validating
> job descriptions, answering employee questions regarding their
> health care and retirement benefits. . . .
>
> Q: Are there other smaller functions?
>
> A: As part of compensation, salary planning is one of the things
> that I work on.  That's really the gist of it.

(Doc. No. 65-24, Ex. M, Deposition of Holly Danilowicz at 9.)  Flannagan—who supervises

Danilowicz—also suggests that she was not assigned some of the more important functions of

Baker's position as an HR manger. (See Flannagan Dep at 37.)  Despite this, considering the

evidence in the light most favorable to Baker and also keeping in mind that establishing a prima

facie case is not meant to be an onerous burden, see e.g., Connolly v. Pepsi Bottling Group,

L.L.C., Case No. 06-1462 2008 WL 4412090, *7 (W.D. Pa. 2008), the Court finds that Baker has

made a showing sufficient to establish the existence of this element of his prima facie case.

**B.  Production of Reasons for Termination**

Because the Court has found that Baker has established a prima facie case of age

discrimination to survive summary judgment, the next step is for the Defendant to produce a

legitimate, nondiscriminatory reason for the adverse employment action.  Brewer, 72 F.3d at 330.

Here, as detailed extensively above, the Defendant claims that Baker had to be terminated

because his supervisors had lost confidence in his ability to operate effectively in the

organization or to provide quality HR services going forward.  They came to this conclusion

because of Baker's handling of the Hawkins and Waltimeyer incidents and also his perceived

relationship with other members of the HR team. Baker does not appear to dispute that this proffer is sufficient for purposes of the *McDonnell Douglas* framework, and the Court finds that the Defendant has satisfied its burden of production in this regard.

### C. Pretext

As explained, the third and final aspect of the *McDonnell Douglas* framework shifts the burden back to the Plaintiff to prove that the reasons provided by the employer for the adverse employment action are pretextual. Id. On summary judgment, a plaintiff may satisfy this burden by "pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Jones v. School Dist. of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). "If the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." Fuentes, 32 F.3d at 764. Baker has not argued that he can point to any evidence to establish an invidious discriminatory reason as a motivating factor, so the Court will focus on his arguments that there is reason here to disbelieve the employer's articulated legitimate reasons for his termination.

In pointing to evidence in the record that would cause a factfinder to reasonably disbelieve the employer's articulated reasons,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the

> employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

Jones, 198 F.3d at 413 (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)).

Baker essentially points to two reasons why a reasonable factfinder could disbelieve the proffered reasons for his termination. He claims that he was a scapegoat for the Waltimeyer and Hawkins incidents and that he did not violate any company policy in his handling of those matters. (Doc. No. 70 at 7.) He also argues that the reasons given for his firing must be pretextual because, according to Baker's version of the events, Flannagan informed Baker in October 2004—after the stated incidents—that he would be watched closely for reasons to terminate his employment if he did not accept a severance. (Id. at 6.) The Court will address these contentions in turn.

### 1. Scapegoat for the Waltimeyer and Hawkins Incidents

Baker argues that he was a scapegoat in the Waltimeyer incident because "the record is clear that Plaintiff did not violate any policy or procedure in his handling of the reduction in force affecting Mr. Waltimeyer. As such, Defendant cannot look to this incident to support a decision to terminate Plaintiff." (Id. at 7.) As discussed above, after Waltimeyer's job had been eliminated in a reduction in force, Baker told Waltimeyer that he could see his ranking and the calculation of that ranking, but he did not inform Waltimeyer about the business case exception or explain that the exception had been applied to lower-ranked employees. (Doc. No. 64 ¶ 106.)

Baker instead informed Waltimeyer that his score was at the bottom of the rankings and he was led to believe that his score was the sole basis for his termination. (Id. ¶¶ 107; 115.) Baker's stated reason for not informing Waltimeyer that he did not have the lowest score was that he felt disclosing the business case exception that had been applied would be like waiving a red flag in front of a bull. (Id. ¶ 111.) There is no dispute, however, that Baker's handling of the incident had caused Waltimeyer to file an ethics complaint leading to investigation by Defendant's in-house counsel, Sharp. (Id. ¶ 110.) There is also no dispute that Sharpe concluded Baker had provided Waltimeyer with false and/or misleading information in his exit interview, and that Sharp, Whillock, and Flannagan, all felt that this was inappropriate. (Id. ¶¶ 114; 118.) In his deposition Flannagan explained why he felt—despite having violated no formal policy—Baker had shown poor judgment:

> Q: So Mr. Baker had not violated any policy with regard to Mr. Waltimeyer?
>
> A: No, he didn't. No, he didn't violate the policy. But as sensitive as reductions in force are and the extent to which Mr. Waltimeyer challenged the decision, and the fact that it is not prohibitive for us to share the fact that there is such a thing as a business case, it is included in the policy. The policy is made available to the public. It's an accepted way to do business. There's nothing wrong with a business case. And Mr. Baker just failed to disclose that.

(Flannagan Dep. at 97: 7-19.)

As discussed above, Hawkins was terminated by Byrnes without following proper procedures and was eventually reinstated after filing an ethics complaint with the Defendant. In that incident, Baker claims that he was singled out to receive the brunt of the criticism despite merely relying on the false information provided to him by Byrnes, all of which he allegedly

relaid to his supervisors. (Doc. No. 70 at 7.) There is no dispute, however, that Flannagan instructed Baker to closely manage and perform due diligence on the Hawkins termination to ensure that Byrnes followed protocol (Doc. No. 64 ¶ 51), serious errors occurred in effecting the Hawkins termination (Id. ¶ 65), and Baker's direct supervisors were all disciplined for their role in the matter. (Id. ¶ 87.)

Given these concerns, the Court cannot say that this proffer is sufficient to show the employer's reliance on these issues is pretextual. Baker does not point to any other responsible individual treated more favorably that would raise an inference of discriminatory motives, and otherwise seems to be inviting the Court to second-guess the business judgment of his supervisors who regarded the incidents as poorly-handled. As discussed above, this is not the Court's role in assessing pretext: "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." See Keller, 130 F.3d at 1109 (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)).

### 2. Flannagan's Comments

Baker's second argument is that the Defendant must not have truly felt his work performance prior to October 2004—including the Waltimeyer and Hawkins incidents—was sufficient to terminate him because of comments made to him by Flannagan in October 2004. As Defendant points out, the record is clear that Baker's supervisors were concerned with his performance in handling the Waltimeyer and Hawkins incidents and with his professional demeanor. Flannagan noted these concerns as early as May 7, 2004, in an interim performance review of Baker. (Doc. No. 64 ¶¶ 121-126.) To address their concerns, Flannagan requested and

Baker provided a performance action plan.  (Id. ¶¶ 127-128.)  Despite Baker's performance

action plan, in the course of reviewing the draft of Baker's 2004 full performance evaluation,

Doty and Flannagan decided Baker could not repair his professional reputation at the company:

> Q: What was the question at issue?
>
> A: The issue was not rehashing the sequence of events that happened with Mr. Waltimeyer, but whether or not Mr. Baker continued to be perceived or received or respected as an HR professional in the organization, and could he operate effectively in that environment going forward.  And [our] conclusion to that was no.

(Flannagan Dep. at 128:21-129:8.)  Doty informed Flannagan that it was his decision whether to

continue Baker on his performance improvement plan, and if he chose not to, then a severance

package would be offered to Baker.  (Doc. No. 64 ¶ 151.)  Though Baker had responded to some

extent to his performance improvement plan, Flannagan concluded that Baker "could never

recover from the fatal errors that he had already committed."  (Flannagan Dep. at 131:17-132:3.)

Having made this determination, Flannagan met with Baker in October 2004 to discuss his

situation.  (Id. at 137: 12-18.)  Baker claims that, at this meeting, Flannagan warned him that if

he did not accept a severance, his work would be scrutinized from that point forward until there

was an opportunity to discipline and finally terminate him.  (Doc. No. 70 at 6.)  As to this

conversation, Baker states in his deposition:

> Q: But my question is: You are told in October that – that you are going to depart from the organization, correct?
>
> A: No.  I was told in October that Elmer wants me out of there. . . .  You have two options: one, we can agree to some type of separation agreement that gives you a soft landing that allows you to get on with your life; or I can start documenting every bad move that you make from this point forward until I build enough of a case to get you out of here. . . . .

> Q: Okay. But he, in fact, told you that – to expect to wrap up your employment in the first quarter – or by the end of the first quarter of 2005; didn't he?
>
> A: And we both agreed to that because – I was – we were both operating under the assumption we were going to be able to come to an agreement.

(Baker Dep. at 166:18-167:4.) Given this testimony, Baker argues that Defendant has implicitly admitted that the two incidents and any other issues documented up through October 2004 were insufficient to warrant his termination and therefore are not the Defendant's true reasons for his ultimate termination. (Doc. No. 70 at 6.) Defendant, for its part, disputes Baker's recounting of the October 2004 conversation, and Flannagan testified at his deposition that he informed Baker that a final decision had already been made to sever his employment at the end of the first quarter of 2005 irrespective of his performance or whether they had reached an agreement on severance:

> Q: After your meeting with Elmer Doty, did you speak to Mr. Baker about his performance evaluation or lack thereof?
>
> A: . . . Yes
>
> Q: What did you tell Mr. Baker?
>
> A: Essentially, I recounted my conversation with Mr. Doty, and – However, during the context of that conversation, never did Mr. Doty direct nor did he suggest that I go dig up stuff on Mr. Baker in order to support a termination, as Mr. Baker alleges. . . .
>
> Q: During the meeting did you tell Mr. Baker that no matter what you do, you will be out of here at the end of the first quarter?
>
> A: I told Mr. Baker that a decision had been reached that we were going to severe his employment and the effective date, whether or not we reached an agreement, would be at the end of the first quarter of 2005.

(Flannagan Dep. at 135:5-16, 149-17-25; see also Doc. No. 64 ¶ 153.)

The Court finds that this is not a genuine dispute of material fact that would preclude summary judgment. Baker's argument does not sufficiently discredit the Defendant's proffered reasons for terminating him. Even assuming Flannagan did tell Baker he could either accept the severance or that his work would be further scrutinized for termination, this does not, as Baker suggests, constitute an implicit admission that his prior acts were insufficient to terminate him. Flannagan simply may have intended to motivate Baker to take a severance, as the easiest and best option for everyone. Or, Flannagan and Doty may have reevaluated Baker's record as it became clear that severance negotiations would be unsuccessful and determined his performance justified termination if amicable severance was not an option. In light of the arguments made by the Defendant and the discussion above, the Court finds that, even considering the record in the light most favorable to Baker, this evidence does not demonstrate weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the Defendant's proffered legitimate reasons such that a reasonable factfinder could rationally find them unworthy of credence.

Because Baker points to no evidence that would cause a reasonable factfinder to disbelieve the Defendant's legitimate reasons for terminating him, the Defendant's motion for summary judgment on this claim will be granted.

## III. RETALIATION

The Defendant has also moved for summary judgment on Baker's retaliation claim, brought under 29 U.S.C. § 623(d), which prohibits discrimination because an individual "has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." As with the anti-discrimination provision discussed above, the

PHRA contains a substantially similar anti-retaliation provision, see 43 Pa. Cons. Stat. § 955(d), and will be interpreted identically in this analysis.

The Court first notes that Baker has failed to address Defendant's arguments in favor of summary judgment on claims made in the amended complaint that Defendant retaliated by excluding Plaintiff from meetings, refusing to communicate, failing to share essential employment information, and failing to offer severance terms offered to other employees who did not engage in protected activity. (Doc. No. 63 at 37-40.) After reviewing the record and Defendant's arguments, the Court will grant Defendant's motion for summary judgment on these issues.

### A.  Prima Facie Case

Baker does not assert that there is any direct evidence of retaliation, so his retaliation claims also proceed under the *McDonnell Douglas* framework.  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).  The Defendant argues that Baker has not established a prima facie case of retaliation.  To establish a prima facie case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

As the Court discussed in its memorandum addressing the Defendant's motion to dismiss, "Plaintiff does not allege that the October 2004 decision to terminate him is the basis of his retaliation claim; rather, Plaintiff asserts that Defendant deliberately advanced the date of his

termination in retaliation for his March 8, 2005, filing with the EEOC for age discrimination."
(Doc. No. 51 at 9.)  The Court went on to note that "in order to survive summary judgment,
Plaintiff certainly will need evidence supporting his allegation that his employment was
terminated sooner than Defendant had initially contemplated when it made its October 2004
decision and that this change in timing was an impermissible reaction to Plaintiff's filing with the
EEOC."  (Doc. No. 51 at 10.)

Baker argues solely that he can establish this required causation for his prima facie case
by pointing at the "temporal proximity" of his EEOC filing on March 3, 2005, and his eventual
termination on April 8, 2005.  (Doc. No. 70.)  It is true that when "only a short period of time
separates an aggrieved employee's protected conduct and an adverse employment decision, such
temporal proximity may provide an evidentiary basis from which an inference of retaliation can
be drawn."  Fasold, 409 F.3d at 189 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280
(3d Cir. 2000)).  Despite this, evidence of temporal proximity, alone, ordinarily is insufficient to
demonstrate a causal link unless the timing is "unusually suggestive" of retaliatory motive.
Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); see also Mclaughlin v.
Fisher, 277 Fed. Appx. 207, 218 (3d Cir. 2008)).  This is because "it is causation, not temporal
proximity itself, that is an element of plaintiff's prima facie case . . . . The element of causation,
which necessarily involves an inquiry into the motives of an employer, is highly context
specific."  Kachmar v. SunGard Data Systems, Inc. 109 F.3d 173, 178 (3d Cir. 1997).  As such,
when the evidence of timing alone is not unusually suggestive, the court should look to "other
evidence gleaned from the record as a whole from which causation can be inferred."  Farrell, 206
F.3d at 281.

There is abundant evidence in the record that, by November 2004—long before he had filed his EEOC complaint—Baker knew he would be departing the company, (see Doc. No. 17 ¶ 22), and he expected to leave sometime around the end of the first quarter of 2005.  There is no dispute that Baker began to prepare a list of tasks to be transitioned to other employees in anticipation of a March 2005 departure date, personally prepared a set of documents to structure his coming termination as a reduction in force, began removing personal effects from his office, and wrote to perspective employers as early as November 2, 2004, to inform them he would be available for hire by March 1, 2005.  (Doc. No. 64 ¶¶ 161; 167;170; 177.)  Baker maintains that he only prepared for a departure because he and Flannagan were under the assumption that an agreement on severance would be reached.  (Doc. No. 70 at 9.)  Despite this, severance negotiations that had been underway for several months at that point were clearly not making any progress.  (Id. ¶ 168.)  The Court cannot find that the temporal proximity of about five weeks is "unusually suggestive" of retaliatory motive in this context.  Employers are not obliged to suspend previously planned or contemplated actions upon learning a discrimination complaint has been filed.  See Windfelder v. May Department Stores Co., 93 Fed. Appx. 351, 355 (3d Cir. 2004) (citing Clark County School Dist. v. Breeden, 532 U.S. 268, 272 (2001)).  A contrary rule might "encourage employees aware of an impending termination to attempt to create their own severance package."  Id.  Baker does not highlight anything else in the record to demonstrate retaliatory intent or from which causation could be inferred.  As such, the Court agrees with the Defendant that "Baker has produced no evidence whatsoever supporting his contention that he would have been terminated subsequent to April 8, 2005 had he not filed a charge of discrimination . . . ."  (Doc. No. 63 at 36.)  Even considering the evidence in the light most

favorable to Baker, the record is not sufficient to support a causal connection between the filing of the EEOC complaint and Baker's sooner than expected termination.

### B. Pretext

Even assuming *arguendo* that Baker could establish his prima facie case of retaliation, he would still need to show that the Defendant's proffered explanation for his termination was pretextual and that retaliation was the real reason for the adverse employment decision.  See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006); see also Carlson v. Township of Lower Alloways Creek, No. 06-3779, 2009 WL 2496523, *8 (D.N.J. 2009).  On this issue, Baker asserts solely that "Plaintiff's claim for retaliation is governed by the same burden-shifting framework as his claim for discrimination, and the analysis regarding pretext remains the same." (Doc. No. 70 at 9.)  As the Court has already discussed, however, Baker's assertions as to pretext are not sufficient to discredit the Defendant's proffered legitimate explanations for his termination.

Because Baker cannot establish a prima facie case of retaliation or show that Defendant's proffered legitimate reasons for his termination are pretextual, Defendant's motion for summary judgment will also be granted on Baker's retaliation claims.

### IV.  CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment.  An order consistent with this memorandum will follow.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES A. BAKER,** | : | |
| | : | **Civil Action No. 1:05-CV-2643** |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **UNITED DEFENSE INDUSTRIES,** | : | |
| **INC., d/b/a BAE SYSTEMS LAND** | : | |
| **& ARMAMENTS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

**AND NOW**, this 30th day of September 2009, upon consideration of the motion for

summary judgment by Defendant United Defense Industries (Doc. No. 62), filed in the above-

captioned matter, and for the reasons set forth in the Court's memorandum opinion filed

herewith, **IT IS HEREBY ORDERED THAT** the motion is **GRANTED**. The Plaintiff's

claims set forth in the amended complaint (Doc. No. 17) are **DISMISSED**.

**IT IS FURTHER ORDERED THAT** the Clerk of Court is directed to enter judgment in

favor of Defendant and against the Plaintiff and to close the file.


 s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania